1  Xinlin Li Morrow (State Bar No. 281707)
   xinlin@morrowfirm.com
2  The Morrow Firm, P.C.
   1880 Century Park E. Suite 815
3  Los Angeles, CA 90067
   (213) 282-8166
4

5  *Attorneys for Defendant*
   BotsCrew, Inc.
6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                    **SAN JOSE DIVISION**

11                                    )   Case No. 5:20-cv-08096-EJD
   OPTRAHEALTH, INC.,                 )
12                                    )   **BOTSCREW, INC.'S NOTICE OF**
              Plaintiff,              )   **MOTION AND MOTION TO DISMISS**
13                                    )   **FOR FAILURE TO STATE A CLAIM**
       vs.                            )   **UNDER RULE 12(b)(6); MEMORANDUM**
14                                    )   **OF POINTS AND AUTHORITIES IN**
   BOTSCREW, INC.,                    )   **SUPPORT THEREOF**
15                                    )
              Defendant.              )   Date:        June 3, 2021
16                                    )   Time:        9:00 a.m.
                                      )   Judge:       Honorable Edward J. Davila
17                                    )   Courtroom:   4
                                      )
18  _____ )

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 2

    A.   The '882 patent ...................................................................................... 2

    B.   Infringement Allegation......................................................................... 3

III.  LEGAL STANDARD ........................................................................................ 6

    A.   Motion to Dismiss Pursuant to Rule 12(b)(6) ....................................... 6

    B.   Patent Eligibility under 35 U.S.C. § 101 ............................................... 7

    C.   *Twombly* pleading standard for direct infringement ............................. 8

IV.  ARGUMENT ..................................................................................................... 9

    A.   The Asserted Claims are Patent Ineligible............................................. 9

          1.   Step 1: The claims are directed to the abstract idea of collecting, analyzing and displaying information. ...................... 9

          2.   Step 2: The claims do not contain an inventive concept.......................... 16

    B.   Optra Does Not Adequately Plead Infringement. ................................. 22

V.   CONCLUSION................................................................................................. 25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
5
   882 F.3d 1121 (Fed. Cir. 2018)..................................................................................6, 7

6

*Adaptix, Inc. v. Apple, Inc.*,
   78 F. Supp. 3d. 952 (N.D. Cal. 2015) ...........................................................................24

7

*Alice Corp. v. CLS Bank Int'l*,
8
   573 U.S. 208 (2014)...............................................................................................*passim*

9

*AlterG, Inc. v. Boost Treadmills LLC*,
10
   388 F. Supp. 3d 1133 (N.D. Cal. 2019) ...............................................................8, 9, 24

11

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
   841 F.3d 1288 (Fed. Cir. 2016)....................................................................................21

12

*Apple, Inc. v. Ameranth, Inc.*,
13
   842 F.3d 1229 (Fed. Cir. 2016)....................................................................................14

14

*Ashcroft v. Iqbal*,
15
   556 U.S. 662 (2009)...................................................................................................6, 8

16

*BASCOM Glob. Internet Servs. V. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016)....................................................................................17

17

*Bascom Research, LLC v. LinkedIn, Inc.*,
18
   77 F. Supp. 3d 940 (N.D. Cal. 2015) ...........................................................................20

19

*Bell Atlantic Corp. v. Twombly*,
20
   550 U.S. 544 (2007)...............................................................................................*passim*

21

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)......................................................................................7

22

*In re Bill of Lading Transmission*,
23
   681 F.3d 1323 (Fed. Cir. 2012)....................................................................................25

24

*Bridge & Post, Inc. v. Verizon Communications, Inc.*,
   778 Fed. App'x 882 (Fed. Cir. 2019).............................................................................8

25

*BSG Tech LLC v. Buyseasons, Inc.*,
26
   899 F.3d 1281 (Fed. Cir. 2018).........................................................................15, 16, 20

27

*ChargePoint, Inc. v. SemaConnect, Inc.*,
28
   920 F.3d 759 (Fed. Cir. 2019)......................................................................................14

*Conley v. Gibson,*
   355 U.S. 41 (1957)........................................................................................................8

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,*
   776 F.3d 1343 (Fed. Cir. 2014)......................................................................13, 16, 21

*Customedia Techs., LLC v. Dish Network Corp.,*
   951 F.3d 1359 (Fed. Cir. 2020)..............................................................................7, 8, 16

*DropBox, Inc. v. Synchronoss Tech., Inc.,*
   815 Fed. Appx. 529 (Fed. Cir. 2020).........................................................14, 17, 18, 21

*Dropbox, Inc. v. Synchronoss Techs., Inc.,*
   371 F. Supp. 3d 668 (N.D. Cal. 2019) ..........................................................................17

*Elec. Power Group, LLC v. Alstom S.A.,*
   830 F.3d 1350 (Fed. Cir. 2016)..............................................................................*passim*

*FairWarning IP LLC v. Iatric Systems Inc.,*
   839 F.3d 1089 (Fed. Cir. 2016)..............................................................................14, 15, 16

*Finjan, Inc. v. Cisco Sys. Inc.,*
   No. 17-cv-00072-BLF, 2017 WL 2462423 (N.D. Cal. June 7, 2017) .......................................25

*Genetic Techs. Ltd. v. Merial L.L.C.,*
   818 F.3d 1369 (Fed. Cir. 2016).....................................................................................7

*Halo Elecs., Inc. v. Pulse Elecs., Inc.,*
   136 S. Ct. 1923 (2016)..................................................................................................25

*Intellectual Ventures I LLC v. Capital One Bank (USA),*
   792 F.3d 1363 (Fed. Cir. 2015).......................................................................................13

*Lee v. City of Los Angeles,*
   250 F.3d 668 (9th Cir. 2001) ...........................................................................................6

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
   566 U.S. 66, 132 S. Ct. 1289 (2012).............................................................................7, 16

*Mymedicalrecords, Inc. v. Walgreen Co.,* Case No. 2:13-cv-00631-ODW (SHx),
   2014 U.S. Dist. LEXIS 176891 (C.D. Cal. Dec. 23, 2014) .......................................................13

*Novitaz, Inc. v. inMarket Media, LLC,*
   No. 16-CV-06795-EJD, 2017 WL 2311407 (N.D. Cal. May 26, 2017).....................8, 9, 22, 24

*NTP, Inc. v. Research in Motion, Ltd.,*
   418 F.3d 1282 (Fed. Cir. 2005).....................................................................................24

*Parks Sch. of Bus., Inc. v. Symington,*
   51 F.3d 1480 (9th Cir. 1995) ..........................................................................................6

*Ricoh Co. v. Quanta Computer Inc.*,
   550 F.3d 1325, 1335 (Fed. Cir. 2009) ..................................................................................23

*Salwan v. Iancu*,
   825 Fed. Appx. 862 (Fed. Cir. 2020) ...........................................................................13, 16

*SAP Am. Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) ......................................................................................11

*Secure Cam, LLC v. Tend Insights, Inc.*,
   351 F. Supp. 3d 1249 (N.D. Cal. 2018) ...........................................................................6, 8

*Secured Mail Solns. LLC v. Universal Wilde*,
   873 F.3d 905 (Fed. Cir. 2017) ..........................................................................................6

*Solutran, Inc. v. Elavon, Inc.*,
   931 F.3d 1161 (Fed. Cir. 2019) ........................................................................................9

*Synopsis, Inc. v. Mentor Graphics, Inc.*,
   839 F.3d 1138 (Fed. Cir. 2016) ........................................................................................8

*TecSec, Inc. v. Adobe Inc.*,
   978 F.3d 1278 (Fed. Cir. 2020) .....................................................................................7, 9

*Trading Techs. Int'l, Inc. v. IBG LLC*,
   921 F.3d 1378 (Fed. Cir. 2019) ........................................................................................7

*Usher v. Los Angeles*,
   828 F. 2d 556 (9th Cir. 1987) ...........................................................................................6

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
   887 F.3d 1376 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 813 (2019) .............................6

**Statutes**

35 U.S.C. § 101 ......................................................................................................1, 7, 9

**Rules**

Fed. R. Civ. P. 8(a)(2) .....................................................................................................8

Fed. R. Civ. P. 12(b)(6) ..............................................................................................1, 6, 7

1

<u>**NOTICE OF MOTION**</u>

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that on June 3, 2021 in Courtroom 4, 5th Floor, of the San Jose

4 Courthouse, 280 South 1st Street, San Jose, California 95113, BotsCrew, Inc. ("BotsCrew") will

5 and hereby does move under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the

6 Complaint filed by OptraHealth, Inc. ("Optra") on November 17, 2020 (ECF No. 1) with respect

7 to all claims of patent infringement of U.S. Patent No. 10,754,882 (the "'882 patent," ECF No. 1-

8 1).  This motion is based on this Notice, the Memorandum of Points and Authorities, the

9 Declaration of Xinlin Li Morrow, all documents in the Court's file, and such other written or oral

10 argument as may be presented at or before the time this motion is heard by the Court.  Exhibits A–

11 C referenced herein are those attached to the Declaration of Xinlin Li Morrow.

12

<u>**STATEMENT OF RELIEF REQUESTED**</u>

13

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, BotsCrew moves to

14 dismiss Optra's Complaint for failure to state a claim upon which relief can be granted.

15

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

16 **I.**     **INTRODUCTION**

17

BotsCrew moves to dismiss the Complaint under Rule 12(b)(6) on two separate grounds.

18 *First*, the patent claims no more than the abstract idea of "simplify[ing] the process of

19 understanding a health report."  '882 patent, 1:48-49.  For this mental process, the claims do not

20 purport to provide any specific technical solution or improvement, such as improved computer

21 functionality or improved database structure.  Instead—and especially under Optra's apparent

22 claim mapping—the claims broadly cover any healthcare-related chat application, using

23 conventional, well-understood and routine computer functionality and database structure.[1]  Under

24 the Supreme Court's holding in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, such patent claims are

25 invalid under 35 U.S.C. § 101. 573 U.S. 208, 311 (2014).

26

*Second*, the Complaint fails to sufficiently plead direct, induced, and willful infringement.

27

28

[1] The claims apparently can even cover chats between a consumer and a healthcare professional as long as the chat occurs over a computer coupled to the recited database systems.

- 1 –

1   The Complaint does not explain how BotsCrew—as opposed to the accused software—practices

2   each step of the asserted method claims.  And the Complaint's allegations of induced and willful

3   infringement consist of bare assertions, without any factual underpinning, that are nearly verbatim

4   from allegations already found by this Court to be insufficient in another case.

5   **II.**   **FACTUAL BACKGROUND**

6          Optra filed this Complaint against BotsCrew on November 17, 2020, alleging that

7   BotsCrew has directly, indirectly, and willfully infringed "at least Claims 1 and 3" of the '882

8   patent "literally or under the doctrine of equivalents."  Complaint, ¶¶ 14, 17, 19-20, 22.

9          **A.**   **The '882 patent**

10         The '882 patent is entitled "Method of Retrieving Information from a Health Report

11  through a Machine Assisted Interrogation Process."  '882 patent, cover (54).  The specification

12  states that the field of the alleged invention of the '882 patent

13         … relates generally to a method of identifying and understanding the information
14         in a health report.  More specifically, the present invention introduces a method for
            a user to understand a personal health report through an interrogation process.

15  *Id,.* 1:10-17.  The '882 patent explains that a supposed problem with understanding a

16  health report is that the report "consists of a set of healthcare related terms and numerical data that
17
    is unfamiliar to an individual not related to the healthcare field."  *Id.*, 1:21-23.  According to the
18
    '882 patent, because of these unfamiliar terms and data, "understanding a health report requires a
19
    considerable amount of time and effort."  *Id.*, 1:23-25.  The '882 patent then asserts that a "lack of
20
    communication between a healthcare professional and a consumer" relating to "the vital
21
    information of a health report" can put "the health of the consumer … in serious risk."  *Id.*, 1:26-
22
    34.  The '882 patent also asserts that another purported "disadvantage of existing health report
23
    [*sic*] is the lack of providing relevant information" such as "what resulted in a certain health
24
    condition or on what can be done to get rid of the condition."  *Id.*, 1:35-41.  Given these perceived
25
    problems, the '882 patent purports to
26
27         … introduce[] a method of interrogation that allows the user to understand the
            content of the health report.  The present invention utilizes a set of systems and
            personal-computing devices that allow the user to directly interact with the present
28         invention.  Overall, the present invention intends to simplify the process of

                                    - 2 –

1    understanding a health report.  *Id.*, 1:43-49.

2    *See also* 2:22-29 ("The present invention introduces a method that can be used to understand the

3    content of a health report.  To do so, the present invention utilizes an interrogation method that

4    allows the user to communicate with a personal assistance device and understand the content of a

5    health report.  By utilizing the present invention, the user can fully understand a health report and

6    avoid any possible discrepancies.").  Thus, according to the specification, the '882 patent aims to

7    improve the mental process of understanding a health report by using a machine as a tool to assist

8    in information retrieval.  *Id.*, claim 1.

9         The claims of the '882 patent do not require any special hardware or software and the

10   specification does not introduce any.  For example, the recited "personal assistance device" may

11   be "a virtual assistance device, a personal computer or mobile phone" without any required

12   feature.  *Id.*, 2:42-44.  The specification describes the recited "reporting system," "query-

13   interrogation system" and "knowledge-graphing system" either in terms of their function or in

14   terms of their database content.  Absent is any specific structure, algorithm or database

15   organization needed to achieve the recited functionality.[2]

16        **B.      Infringement Allegation**

17        The Complaint uses the term "Accused Products" without defining what the term means.

18   Complaint, ¶¶ 14-15, 18-20.  The only product that the Complaint has specifically identified is the

19   Genetic Testing Chatbot designed for Natera.  *Id.*, ¶ 14.  The Complaint alleges that "the Accused

20   Products perform methods" with steps recited in claim 1.  *Id.*, ¶ 15, 5:13-6:6 (*compare* listed steps

21   ─────────────────

22        [2] *Id.*, 2:30-32 ("a reporting system that comprises a plurality of health reports and a query-
     interrogation system"); 2:36-38 ("The query-interrogation system is used to extract the required

23   information from the plurality of health reports through an interrogation method"); Abstract ("The
     knowledge-graphing system, which is generated using [unspecified] artificial intelligence modules,

24   natural language understanding modules, and machine learning modules, is utilized to provide
     accurate results to the user."); 2:54-57 ("To provide the most relevant information to the health

25   report-related query, the present invention compiles a corresponding knowledge corpus for the
     specific health report through a knowledge-graphing system…."); 2:6-65 ("The query-related

26   knowledge graph is generated according to the health report-related query. …[T]he report-related
     knowledge graph is generated from the specific health report and other sources of information which

27   can be, but is not limited to, thesauruses, healthcare and literature database."); 3:15-18 ("A report-
     related knowledge-graph is thus a collection of data from the report and related information from

28   other data sources, organized as a graph of associations of various healthcare entities").

A-J with '882 patent, claim 1). As shown in the chart below, those recited steps merely parrot the language of the claims, and at least for several elements, without any factual underpinning:

| Claim Language | Accused Products |
|---|---|
| 1.  A method of retrieving information from a health report through a machine assisted interrogation process comprises the steps of:<br><br>(A) providing a personal assistance device, wherein the personal assistance device is communicably coupled with a reporting system; | "[T]he Accused Products provide a personal assistance device that includes the reporting system of the genetic testing chatbot." Complaint, 6:6-7.<br><br>"Defendant's Genetic Testing Chatbot includes a personal assistance device that enables a customer to 'chat with the bot to discuss specific genetic test results.'" *Id.*, 3:25-4:15 (citing ECF No. 1-2, pages 4-5,7)). |
| (B) providing a reporting system, wherein the reporting system comprises a plurality of health reports and a query-interrogation system; | "The Accused Products provide the chatbot reporting system including health reports such as the genetic tests and a query-interrogation system such as chatbot system that receives input queries and provides output." Complaint, 6:7-10. |
| (C) receiving a health report-related query through the personal assistance device, wherein the health report-related query corresponds to a specific health report from the plurality of health reports; | "The Accused Products receives [sic] a health report-related query corresponding to a specific health report from the set of health reports, for example, by receiving queries for 'specific genetic test results' (Exhibit 2 at page 4)." *Id.*, 6:10-13. |
| (D) forwarding the health report-related query to the reporting system through the personal assistance device; | "The Accused Products forward the query to the reporting system by forwarding the queries from the personal assistance devices to the chatbot." *Id.*, 6:13-14. |
| (E) selecting the specific health report from the plurality of health reports **through the query-interrogation system**; | "The Accused Products select the specific health report by providing for discussions of specific genetic test results." *Id.*, 6:15-16.<br><br>There is no allegation whether the selection is done by the query-interrogation system or something else. |
| (F) compiling a corresponding knowledge corpus for the specific health report **through a knowledge-graphing system, wherein the corresponding knowledge corpus includes a** | "The Accused Products compile corresponding knowledge corpus by gathering the collection of records associated with the specific genetic tests." *Id.*, 6:16-17. |

- 4 –

| Claim  Language | Accused Products |
|---|---|
| **query-related knowledge graph and a report-related knowledge graph**; | There is no allegation regarding what constitutes a knowledge-graphing system, whether the gathering of the collection of records were done through the knowledge-graphing system, what the collection of records gathered consist of and what components of collected records correspond to the query-related knowledge graph and what components of the collected records correspond to the report-related knowledge graph. |
| (G) extracting a list of query-related information from the corresponding knowledge corpus of the specific health report **by comparing and associating the query-related knowledge graph with the report-related knowledge graph through the knowledge-graphing system**; | "The Accused Products extract a list of query-related information to be able to enable the chatbot to function to provide responses for the queries from the personal assistance device." *Id.*, 6:17-19<br><br>There is no allegation regarding how the extraction is done. |
| (H) forwarding the list of query-related information from the reporting system to the personal assistance device; | "The Accused Products forward the list of query-related information to the personal assistance device to output the results on the personal assistance device." *Id.*, 6:19-21. |
| (I) converting the list of query-related information to an output content file through the query-interrogation system; and | "The Accused Products convert the list of query-related information to an output content file o the personal assistance device." *Id.*, 6:22-23. |
| (J) outputting the output content file through the personal assistance device. | "The Accused Products output the output content file through the personal assistance device." *Id.*, 6:23-24. |

Further, although the asserted claims are all method-of-use claims, Optra does not provide any facts from which to infer that BotsCrew, whose operations are based overseas, performs at least one step in the U.S. *See* Ex. C ("BotsCrew is the global leader in Chatbots Development with offices in London, UK, and Lviv, Ukraine."). And although Optra accuses BotsCrew of induced infringement, there is no allegation that BotsCrew knows how its client(s) deploys the chatbot application or whether any modifications were made to the delivered application.

1    Optra also alleges without more that "[o]n information and belief, BotsCrew's

2  infringement has been and continues to be willful," without naming any specific conduct that it

3  contends renders BotsCrew's conduct willful.  Complaint, ¶ 22.

4  **III.**    **LEGAL STANDARD**

5         **A.**    **Motion to Dismiss Pursuant to Rule 12(b)(6)**

6    "A motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6) tests the legal sufficiency of

7  claims alleged in the complaint." *Secure Cam*, 351 F. Supp. 3d 1249, 1253 (N.D. Cal. 2018)

8  (citing *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).  "To survive a

9  motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

10 claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

11 omitted).  Facial plausibility exists only if "the plaintiff pleads factual content that allows the court

12 to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

13 Dismissal under Rule 12(b)(6) is thus appropriate if the factual allegations do not 'raise a right to

14 relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

15    On a motion to dismiss, "the court 'must presume all factual allegations of the complaint to

16 be true and draw all reasonable inferences in favor of the nonmoving party.'"  *Secure Cam*, 351 F.

17 Supp. 3d at 1253 (citing *Usher v. Los Angeles*, 828 F. 2d 556, 561 (9th Cir. 1987)).  But "courts

18 are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550

19 U.S. at 555.  Nor need the court "accept as true allegations that contradict matters properly subject

20 to judicial notice or by exhibit," including the claims, the patent specification, and "material

21 submitted as part of the complaint or relied upon in the complaint." *Secured Mail Solns. LLC v.*

22 *Universal Wilde*, 873 F.3d 905, 913 (Fed. Cir. 2017); *Secure Cam*, 351 F. Supp. 3d at 1253 (citing

23 *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001)).

24    "Patent eligibility can be determined at the Rule 12(b)(6) stage 'when there are no factual

25 allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'"  *Voter*

26 *Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1384 (Fed. Cir. 2018), *cert. denied*,

27 139 S. Ct. 813 (2019); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125

28 (Fed. Cir. 2018).  Evaluation of a patent claim's subject matter eligibility under 35 U.S.C. section

1   101 can proceed even before a formal claim construction. *Genetic Techs. Ltd. v. Merial L.L.C.*,

2   818 F.3d 1369, 1373–74 (Fed. Cir. 2016); *see also Aatrix*, 882 F.3d at 1125.

3       **B.      Patent Eligibility under 35 U.S.C. § 101**

4           "Patent eligibility under § 101 is an issue of law that may contain underlying issues of

5   fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).  The Supreme Court has

6   established a two-step framework to evaluate patent eligibility.  *See Alice Corp. v. CLS Bank Int'l*,

7   573 U.S. 208, 217 (2014).  The first step involves determining whether the claims are "directed

8   to" a law of nature, natural phenomenon, or abstract idea.  *Alice*, 573 U.S. at 217.  If so, the Court

9   must "consider the elements of each claim both individually and 'as an ordered combination' to

10  determine whether the additional elements 'transform the nature of the claim' into a patent-eligible

11  application." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012)).

12          The Federal Circuit has "described the first-stage inquiry as looking at the 'focus' of the

13  claims, their 'character as a whole," and the second-stage inquiry … as looking more precisely at

14  what the claim elements add—specifically, whether … they identify an 'inventive concept' 'in the

15  application of the ineligible matter to which … the claim is directed." *Elec. Power Group, LLC v.*

16  *Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

17          "In cases involving software innovations, [the step-one] inquiry often turns on whether the

18  claims focus on specific asserted improvements in computer capabilities or instead on a process or

19  system that qualifies as an abstract idea for which computers are invoked merely as a tool."

20  *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278 (Fed. Cir. 2020).  In that vein, automating a mental

21  process such as collecting, analyzing, and displaying information in a more user-friendly manner

22  is an abstract idea.  *Elec. Power*, 830 F.3d at 1353-54.  Likewise, "improving a user's experience

23  while using a computer application is not … sufficient to render the claims directed to an

24  improvement in computer functionality." *Customedia Techs., LLC v. Dish Network Corp.*, 951

25  F.3d 1359, 1365 (Fed. Cir. 2020) (citations omitted); *see also Trading Techs. Int'l, Inc. v. IBG*

26  *LLC*, 921 F.3d 1378, 1384-85 (Fed. Cir. 2019) (holding that claims "focused on providing

27  information to traders in a way that helps them process information more quickly" did not

28  constitute a patent-eligible improvement to computer functionality).

1    The abstract nature of a claim cannot be saved by alleged novelty or usefulness of the

2  claims.  *Bridge & Post, Inc. v. Verizon Communications, Inc.*, 778 Fed. App'x 882, 892 (Fed. Cir.

3  2019) ("Where a claim's essential advance is abstract, a novel method of performing that advance

4  does not avoid the problem of abstractness."); *Synopsis, Inc. v. Mentor Graphics, Inc.*, 839 F.3d

5  1138, 1151 (Fed. Cir. 2016) ("A claim for a *new* abstract idea is still an abstract idea.").

6    *Alice* step 2 examines whether elements, individually and as a whole, transform the

7  ineligible matter into a patent-eligible application.  *Customedia*, 951 F.3d at 1365.  "[T]he mere

8  recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-

9  eligible invention."  *Alice*, 573 U.S. at 223.  Likewise, "the invocation of 'already-available

10 computers that are not themselves plausibly asserted to be an advance … amounts to a recitation

11 of what is well-understood, routine, and conventional.'"  *Customedia*, 951 F.3d at 1365.

12    **C.    *Twombly* pleading standard for direct infringement**

13    Under Rule 8(a), a complaint must plead facts sufficient to "show[] that the pleader is

14 entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The purpose of this rule is to ensure that the plaintiff

15 "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests."

16 *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  "[A] plaintiff's obligation to provide the 'grounds' of

17 his 'entitle[ment] to relief'" under Rule 8(a) "requires more than labels and conclusions, and a

18 formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S at 555.

19    The *Twombly* pleading standard applies to allegation of direct infringement since

20 abrogation of Form 18 on December 1, 2015.  *Novitaz, Inc. v. inMarket Media, LLC*, No. 16-CV-

21 06795-EJD, 2017 WL 2311407 (N.D. Cal. May 26, 2017).  Thus, to state a claim for patent

22 infringement, a patentee must "plead facts sufficient to place the alleged infringer on notice."

23 *Secure Cam, LLC v. Tend Insights, Inc.*, 351 F. Supp. 3d 1249, 1253 (N.D. Cal. 2018) (citation

24 omitted).  "A direct infringement claim 'does not satisfy the standards of *Twombly* and *Iqbal*

25 where it does not at least contain factual allegations that the accused product practices every

26 element of at least one exemplary claim.'"  *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d

27 1133, 1142-43 (N.D. Cal. 2019) (citing *Novitaz*, 2017 WL 2311407, at *3).  "This requirement is

28 animated by the principle that 'the failure to meet a single limitation is sufficient to negate

1   infringement of [a] claim.'" *AlterG*, 388 F. Supp. 3d at 1143 (citation omitted).

2   **IV.   ARGUMENT**

3       **A.   The Asserted Claims are Patent Ineligible.**

4       The Complaint only asserts Claims 1 and  3.  Claim 1 is representative; claim 3 depends

5   from claim 1 and adds only the limitation that the recited "personal assistance device is a graphical

6   user interface" ("GUI") and that the output of the query is displayed on the GUI.  '882 patent,

7   claim 3.**[3]**

8       Optra admits that the claims are directed to "technologies for retrieving information from

9   healthcare reports using a personal assistance device …."  Complaint, ¶ 8.  The Federal Circuit has

10  made clear that claims directed to "collecting information, analyzing it, and displaying certain

11  results of the collection and analysis" "focus on an abstract idea."  *Elec. Power*, 830 F.3d at 1353.

12  Implementing such an abstract idea on an unspecified, generic computer without improvement to

13  the functionality of the computer itself does not transform this abstract idea to a patent-eligible

14  technical solution to a technical problem.  *Id.* at 1354 (claims at issue in *Elec. Power* are abstract

15  because " the focus of the claims is not on … an improvement in computers as tools, but on

16  certain independently abstract ideas that use computers as tools").  The claims also do not contain

17  any inventive concept that would transform them into a patent-eligible application of the idea.

18  Therefore, the asserted claims are invalid under Section 101.

19          **1.   *Step 1: The claims are directed to the abstract idea of collecting,
        analyzing and displaying information.***

20

21  *Alice* Step One's "directed to" inquiry asks "what the patent asserts to be the 'focus of the

22  claimed advance over the prior art.'"  *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed.

23  Cir. 2019) (citations omitted).  This step "focus[es] on the language of the Asserted Claims

24  themselves" "considered in light of the specification."  *TecSec*, 978 F.3d at 1292.

25      The claims at issue are methods "of retrieving information from a health report through a

26  machine assisted interrogation process."  '882 patent, claim 1[pre].  The '882 specification makes

27      **[3]** Even if the Plaintiff had asserted all claims of the patent, claim 1 would still be

28  representative because the other claims add nothing but generic software components defined by
    their functions rather than specific algorithms or hardware/data structures.

clear that the "focus of the claimed advance over the prior art" is not in the improvement of the functionality of the machines used for retrieving the information, but using machine as a tool for organizing and presenting health-related information:

> **Field of the Invention**: "The present invention relates generally to a method of identifying and understanding the information in a health report.  More specifically, the present invention ***introduces a method for a user to understand a personal health report through an interrogation process***."

> **Stated Objectives**:  "[T]he present invention introduces a method of interrogation that allows the user to understand the content of the health report.  The present invention utilizes a set of systems and personal-computing devices that allow the user to directly interact with the present invention.  ***Overall, the present invention intends to simplify the process of understanding a health report***."

> **Detailed Descriptions of the Invention**: "The present invention introduces a method that can be used to understand the content of a health report.  To do so, the present invention utilizes an interrogation method that allows the user to communicate with a personal assistance device and understand the content of a health report.  By utilizing the present invention, ***the user can fully understand a health report and avoid any possible discrepancies***."

'882 patent, 1:10-17, 1:43-49, 2:23-29 (emphasis added).

The patent is therefore explicit that it is attempting to patent the mental process of communicating information.  *See* '882 patent, 1:26-41.  According to the specification, the traditional manner in which a health report is presented suffers from two perceived drawbacks:

(1) a perceived "lack of communication between a healthcare professional and a consumer" such as a lack of clear communication of "vital information" in the report; and

(2) a perceived "lack of providing relevant information" such as the action plan in light of the data in the health report.  *Id.*

Thus, like the patent-ineligible claims at issue in *Electric Power*, the advance that the claims of the '882 patent "purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions."  830 F.3d at 1354.  Such claims are directed to abstract ideas.  *Id.*; *see also SAP Am. Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167-68 (Fed. Cir.

2018) (claims patent ineligible when directed to "selecting certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis").  Indeed, as the chart below illustrates, the '882 patent is directed to nothing more than using machines as a tool to perform tasks long performed by human beings:

| Claim Language | Example of Corresponding Human Activity |
| --- | --- |
| 1.  A method of retrieving information from a health report through a machine assisted interrogation process comprises the steps of:<br><br>(A) providing a personal assistance device, wherein the personal assistance device is communicably coupled with a reporting system;<br><br>(B) providing a reporting system, wherein the reporting system comprises a plurality of health reports and a query-interrogation system; | A process whereby a medical assistant retrieves and provides information requested by a patient:<br><br>The medical assistant at the medical office is provided with a personal computer having a graphical user interface, and the personal computer is connected to a medical record database that includes the patients' health records, test results and software that enables user interface for query input and result output, search and information extraction function. |
| (C) receiving a health report-related query through the personal assistance device, wherein the health report-related query corresponds to a specific health report from the plurality of health reports;<br><br>(D) forwarding the health report-related query to the reporting system through the personal assistance device;<br><br>E) selecting the specific health report from the plurality of health reports through the query-interrogation system; | The medical assistant receives a query from a patient regarding the test result ordered by the doctor (which may be by phone or by email).<br><br>The medical assistant retrieves from the computer the test result through the user interface of medical records' database (and the database has software that allows the selection to be done in response to the inputted patient information). |
| (F) compiling a corresponding knowledge corpus for the specific health report through a knowledge-graphing system, wherein the corresponding knowledge corpus includes a query-related knowledge graph and a report-related knowledge graph;<br><br>(G) extracting a list of query-related information from the corresponding knowledge corpus of the specific health report by comparing and associating the query-related knowledge graph with the report- | The medical assistant leaves the doctor with a note containing the patient's query regarding her test result and a link to (or a copy of) the patient's medical history and test result.<br><br>The doctor reviews the patient's query and the patient's file, updates the medical record of the patient in the database with notes regarding the patient's test results and instructions on the next step  (*e.g.*, the results look good and |

| Claim Language | Example of Corresponding Human Activity |
|---|---|
| related knowledge graph through the knowledge-graphing system; | continue with your medication, or please schedule an appointment as soon as possible). |
| (H) forwarding the list of query-related information from the reporting system to the personal assistance device;<br><br>(I) converting the list of query-related information to an output content file through the query-interrogation system; and<br><br>(J) outputting the output content file through the personal assistance device. | The medical assistant exports the doctor's new notes to her computer and provides that information to the patient through her computer. |

Optra's infringement assertion confirms that the '882 patent is directed to using a machine as a tool to perform human interactions. Specifically, Optra accuses BotsCrew's health-care related chatbot of infringing the '882 patent. Complaint, ¶¶ 9-10, 14-15.



As Exhibit 2 to the Complaint makes clear, the accused Chatbot merely uses a conversation robot that follows certain prescribed scripts in place of a human being that can follow the same script and provide the same information. *See* ECF No. 1-2 at 5, 7 (reproduced above). The claims at issue therefore clearly "read on organizing human activity with respect to medical information, *i.e.*, abstract processes that can be performed by an individual." *Salwan v. Iancu*, 825

- 12 –
MOTION TO DISMISS

Fed. Appx. 862, 866 (Fed. Cir. 2020); *see also Mymedicalrecords, Inc. v. Walgreen Co.*, Case No. 2:13-cv-00631-ODW (SHx), 2014 U.S. Dist. LEXIS 176891, at *11 (C.D. Cal. Dec. 23, 2014) ("The concept of secure record access and management, in the context of personal health records or not, is an age-old idea.") (collecting cases).  Automating such "fundamental […] practice long prevalent in our system" remains an abstract idea.  *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) (quoting Alice, 134 S.Ct. at 2356); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions.").

The inclusion of "personal assistance device" and various software systems (*i.e.*, the recited reporting system, interrogation system or knowledge-graphing system) in the claims also does not render the claims non-abstract.  This is because neither the claim language nor the specification assigns any improved functionality to these tools.  Instead, these components are at most described in terms of their functionality and/or as conventional components used in their conventional roles:

- 2:42-43 ("The personal assistance device can be … a virtual assistance device, a personal computer or mobile phone); claim 3 ("the personal device assistance is a graphical user interface");

- 2:30-34 ("a reporting system that comprises a plurality of health reports and a query-interrogation system … The reporting system is preferably managed by at least one remote server");

- 2:36-38 ("The query-interrogation system is used to extract the required information from the plurality of health reports according to the user input");

- 2:57-78 ("a knowledge-graphing system which is preferably managed by the at least one remote server"), Abstract ("The knowledge-graphing system, which is generated using artificial intelligence modules, natural language understanding modules, and machine learning modules, is utilized to provide accurate results to the user");

- 13 –

- 2:60-62 ("The query-related knowledge graph is generated according to the health report-related query");

- 2:62-65 ("[T]he report-related knowledge graph is generated from the specific health report and other sources of information which can be … thesauruses, healthcare and literature databases"); 3:15-18 ("A report-related knowledge graph is thus a collection of data from the report and related information from other data sources, organized as a graph of associations of various healthcare entities").

To claim a patent eligible concept, the claims need to be directed to a specific implementation of a solution to a technical problem, that is, they have to recite "*how to* solve the problem in a manner that encompasses something more than the 'principle in the abstract.'" *DropBox, Inc. v. Synchronoss Tech., Inc.*, 815 Fed. Appx. 529, 533 (Fed. Cir. 2020) (citing *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) for the proposition that "an invention may not be patent eligible if the "claims 'were drafted in such a result-oriented way that they amounted to encompassing the 'principle in the abstract' no matter how implemented'").  Here, the plain language of the claims indicate that the claims are drafted in a results-oriented way, without requiring any specific implementations.  *Cf.*, *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) (finding ineligible claims that do not recite "a particular way of programming or designing the software to create menus that have these [desired] features, but instead merely claim the resulting systems."); *FairWarning IP LLC v. Iatric Systems Inc.*, 839 F.3d 1089, 1092-93 (Fed. Cir. 2016) (claims directed to "[a] method of detecting improper access of a patient's protected health information (PHI) in a computer environment" found patent ineligible because the claims merely recite a set of rules for auditing log data without any specificity on how the auditing occurs).

Optra may argue that the knowledge-graphing system, and inquiry- or report-related knowledge graphs provide a specific technical improvement that "provide[s] accurate results to the user." '882 patent, Abstract.  But these elements are not different than the set of audit rules at issue in *FairWarning* that are used for monitoring log data to see whether the records were improperly accessed.  As the citations of the '882 patent's specification on pages 13–14 above

1    indicate, these are just collections of data used for cross-referencing hits (just like *FairWarning*'s

2    audit rules and actual monitor data log); and like claims in *FairWarning*, no specific

3    implementation or comparison details are required.  There is also nothing in the complaint

4    allowing one to infer that the knowledge graphing system or graphs constitute(s) a specific

5    technical implementation to a technical problem: as discussed in Section IV.B (insufficient

6    pleading), Optra does not link any specific data structure in the chatbot application to the alleged

7    knowledge graphs.  *See also BSG Tech LLC v. Buyseasons, Inc*., 899 F.3d 1281, 1286 (Fed. Cir.

8    2018) (invalidating patent-in-suit that does recite a specific type of data structure because the

9    patentee "does not purport to have invented database structures that allow database users to input

10   item data as a series of parameters and values.") (collecting cases).  Indeed, the chatbot identified

11   in the complaint follows predetermined scripts.  *See* Complaint, ¶ 10; ECF No. 1-2 (Exhibit 2 to

12   Complaint).

13          Optra may believe that it deserves something for its 200 person-month efforts to index and

14   filter medical records, (*see* Ex. A [provisional] at 3:15-18), but its claims do not specifically cover

15   that process of creating the knowledge database. Even if they tried, the patent law does not uphold

16   such claims to collecting and analyzing "information."  *FairWarning*, 839 F.3d at 1093 (claims

17   directed to a combination of abstract ideas, such as "collecting information," "analyzing

18   information by steps people go through in their minds, or by mathematical algorithms," and

19   "presenting the results of abstract processes of collecting and analyzing information," without

20   more, remain abstract).

21          The Federal Circuit has also "held that improving a user's experience while using a

22   computer application is not, without more, sufficient to render the claims directed to an

23   improvement in computer functionality."  *Id.*  Hence, although the '882 patent purportedly can

24   "assist[] [patients] in processing information more quickly," "this purported improvement in user

25   experience did not 'improve the functioning of the computer, make it operate more efficiently, or

26   solve any technological problem."  *Id.* (citation omitted); *see also BSG*, 899 F.3d at 1287-88

27   (purported benefits of allowing user "to quickly and efficiently … find only those few records that

28   are relevant" among the hundreds of thousands or even millions of records "flow from performing

1  an abstract idea in conjunction with a well-known database structure" as the focus of the claims "is

2  unrelated to the how databases function").

3      Moreover, courts have repeatedly distinguished "between… computer-functionality

4  improvements and … uses of existing computers as tools in aid of processes focused on 'abstract

5  ideas.'" *Elec. Power*, 830 F.3d at 1354.[4]  Thus, because "the claims are directed to well-known

6  business practices, the claimed elements of a generic ['personal assistance device' and software

7  modules] are simply not enough to transform the abstract idea into a patent-eligible invention."

8  *Salwan*, 825 Fed. Appx. at 866. The claims are therefore directed to an unpatentable abstract idea.

9          **2.      *Step 2: The claims do not contain an inventive concept.***

10      The second step of the patent eligibility analysis examines whether the challenged claims

11  contain an "'inventive concept'—i.e., an element or combination of elements that is 'sufficient to

12  ensure that the patent in practice amounts to significantly more than a patent upon the ineligible

13  concept itself.'" *Alice*, 134 S. Ct. at 2357 (quoting Mayo, 132 S. Ct. at 1294).

14      Here, as noted above, the claims recite generic computer components such as a "personal

15  assistance device" and black-box modules with names describing the functions of those modules,

16  such as "reporting system," "query-interrogation system" and "knowledge-graphing system."  *See*

17  '882 patent, claim 1.  That is, like the elements that the Federal Circuit found to be insufficient to

18  save the abstract claims in *Dropbox*, the claims here "recite[] conventional elements in a purely

19  functional manner, without implementation detail even in the specification."  *Dropbox*, 815 Fed.

20  _____

21      [4] *See also FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016)
(holding ineligible computer-implemented claims where "it is this incorporation of a computer, not

22  the claimed rule, that purportedly improves the existing technological process by allowing the
automation of further tasks") (internal quotation omitted); *Content Extraction*, 776 F.3d at 1347

23  (using machine as a tool in place of human being to process information from paper check is an
abstract idea); *Salwan*, 825 Fed. Appx. at 866 (claims that "merely recited well-known process

24  related to organizing patient health … and add the requirement of implementing them on a
computer" are not patent eligible); *Customedia*, 951 F.3d at 1364-65 (collection and discussion of

25  cases where claims "invok[ed] a computer merely as a tool"); *BSG*, 899 F.3d at 1286 (benefits from
the invalid patent-in-suit "are not improvements to database functionality [and i]nstead, they are

26  benefits that flow from performing an abstract idea in conjunction with a well-known database
structure.").   In other words, "the ['882 patent's] claims were focused not on physical-realm

27  improvement to computers as tools, but rather an improvement in wholly abstract ideas."

28  *Customedia*, 951 F.3d at 1365 (citation omitted).

1    Appx. at 533 (citing with approval district court's finding in *Dropbox, Inc. v. Synchronoss Techs.,*

2    *Inc.*, 371 F. Supp. 3d 668, 698 (N.D. Cal. 2019)).  For example, the "reporting system" is merely

3    described as "compris[ing] a plurality of health reports and a query-interrogation system" that is

4    "communicably coupled with" a personal assistance device (such as a computer, a mobile phone)

5    and to which a health report-related query is forwarded.  '882 patent, 2:30-32, 2:40-44, claim 1

6    (A)-(B), (D).  This description can cover any conventional medical record database accessible by a

7    computer; and the specification and the claims do not otherwise set any other limitation on the

8    "reporting system."

9           As another example, the "query-interrogation system" is merely described as "used to

10   extract the required information from the plurality of health reports according to the user input."

11   '882 patent, 2:36-38; Abstract ("A user utilizes the personal assistance device to submit a query

12   that retrieves information from the reporting system via the query-interrogation system."); claim

13   1(E) ("selecting the specific health report from the plurality of health reports through the query-

14   interrogation system"), 1(I) ("covering the list of query-related information to an output file

15   through the query-interrogation system").  But there is no disclosure whatsoever on *how* the

16   information is to be extracted from the reporting system's health reports according to the user

17   input, *how* the selection of a particular health report is to be done, or *how* the conversion of the list

18   of query-related information to an output file is to be done.  Thus, there is no "specific, discrete

19   implementation of the abstract idea" where the "particular arrangement of elements is a technical

20   improvement over [the] prior art."  *BASCOM Glob. Internet Servs. V. AT&T Mobility LLC*, 827

21   F.3d 1341 (Fed. Cir. 2016).  "At best, the claims recite the application of an abstract idea using

22   conventional and well-understood techniques specified in broad, functional language."  *Dropbox*,

23   815 Fed. Appx. at 534.

24          Concerning the "knowledge-graphing system," the only description appears in the abstract,

25   but even then only in broad strokes: "The knowledge-graphing system, which is generated using

26   artificial intelligence modules, natural language understanding modules, and machine learning

27   modules, is utilized to provide accurate results to the user."  '882 patent, Abstract.  The

28   specification does not describe any non-conventional natural language, machine learning or

artificial intelligence modules.[5]  *E.g.*, '882 patent, Figs. 11-12 ("providing a natural language-understanding system" or "Providing a self-learning system" without giving any structural or algorithmic detail of these systems), 3:57-63 ("To understand the health-report related query that was received from the user, the present invention utilizes a natural language-understanding system … More specifically, the natural language-understanding system is used to identify and extract the meaning of the health-report related query."); 3:66-4:13 ("[T]he present invention also consists of a self-learning aspect that allows the present invention to update the corresponding knowledge corpus upon receiving the health report-related query" wherein self-learning is done by comparing "the second list of relevant information with a plurality of data-fields on the corresponding corpus" and updating the data fields with the second list for missing information]").

The claims are also not limited to these machine-generated knowledge-graphs, because neither artificial intelligence nor machine learning modules are part of the asserted claims 1 and 3 and appear instead in unasserted dependent claims 12 and 13.  *Cf.*, *Dropbox*, 815 Fed. Appx. at 536 ("a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims ….").  Indeed, the provisional application to which the '882 Patent claims priority describes a 200-person-month effort to filter and index medical records and concepts, presumably without the aid of "artificial intelligence" or "machine learning modules"  Ex. A [provisional] at 3:15-18.  The specification also does not assert that the resulting knowledge-graphs have any non-conventional, non-routine or not well-known data structures.  *See* '882 patent *generally*.

Concerning the two recited steps involving the knowledge-graphing system, 1(F)-1(G), the limitations are again broadly drafted in functional terms without any specifically inventive implementations: "compiling a corresponding knowledge corpus for the specific health report through a knowledge-graphing system" and "extracting a list of query-related information from the corresponding knowledge corpus of the specific health report by comparing and associating

---

[5] If Optra claims that these modules are not conventional ones well-known to a person of ordinary skill in the art, then the '882 patent would be invalid for lack of sufficient written description and enablement under section 112 of the Patent Act because the it does not provide sufficient disclosure of *how* the "knowledge-graphing system" is generated.

- 18 –

the query-related knowledge graph with the report-related knowledge graph through the knowledge-graphing system." '882 patent, claim 1(F), 1(G).  No specific implementation—and certainly nothing beyond the realm of conventional, routine and well-understood structure and algorithm—is required for the compilation, extraction, comparison or association.  The little technical description in the specification is also not incorporated into the claims, and does not state that it involves anything but routine, well-known and conventional algorithms and structures:

- 2:67-3:15 ("the specific health report is scanned with the knowledge-graphing system to identify a first list of relevant information … When the first list of relevant information is identified, a coreference resolution method is applied via the knowledge-graphing system to generate a plurality of report-related expressions that is then saved into the report-related knowledge graph"), *cf.* claim 8;

- 3:47-65 ("the present invention monitors the health report-related query and identifies a second list of relevant information through the knowledge-graphing system. … When the second list of relevant information is identified, a coreference resolution method is applied via the knowledge-graphing system to generate a plurality of query-related expressions that is then saved into the query-related knowledge graph");

- 4:46-54 ("[T]he knowledge-graphing system extracts a list of query-related information from the corresponding knowledge corpus of the specific health report. To do so, the query-related knowledge graph is compared and associated with the report-related knowledge graphing system.  By doing so, the knowledge-graphing system determines a plurality of intersection points that is then used to extract the list of query-related information").

The lack of the implementation details in the '882 claims is fatal to the second step of *Alice* analysis because in the absence of such details, the claims amount to "merely 'the application of an abstract idea using conventional and well-understood techniques" and have "not been transformed into a patent-eligible application of the abstract idea."  *BSG Tech.*, 899 F.3d at 1290-91; *see also id.* at 1287 (when a "recited database structure … provides a generic environment in

- 19 –

1    which the claimed method is performed," the claim is still directed to an abstract idea).

2    In that vein, the claims' invocation of "query-related knowledge graph" and "report-related

3    knowledge graph" also do not supply the missing inventive concept.  These knowledge graphs are

4    merely collections of specific data organized as graphs of associated concepts (*e.g.*, '882 patent,

5    3:15-18).  The specification does not describe any inventive data structure and the claims certainly

6    do not recite any inventive data structures.  In fact, given Optra's infringement theory, the mere

7    association of test results and overview of implication of the results can result from human effort.

8    *Cf.*, Ex. A [provisional] at 3:15-18 (purportedly spending "over 200 persons, months of efforts to

9    curate, filter, and index of 65 million records"); Ex. B [Oct. 2020 letter] at 2 (referring BotsCrew

10   to a truncated claim 1 without claim terms such as "query-interrogation system," "knowledge-

11   graphing system," "report-related knowledge graphs" and "report-related knowledge graphs").

12   Indeed, as this Court noted, "the concept of establishing and using relationships between

13   documents is a common, age-old practice" and "can also be performed mentally." *Bascom*

14   *Research, LLC v. LinkedIn, Inc.*, 77 F. Supp. 3d 940, 949-50 (N.D. Cal. 2015).

15   The limitation of a generic "personal assistance device" to an unspecified "graphical user

16   interface" (GUI) similarly cannot not save claim 3 because by 2017 (the claimed priority date of

17   the '882 patent), GUIs had become conventional, well-understood, and routine components for

18   displaying information.  *Cf. Elec. Power* (displaying data in graphical form is not sufficient to

19   satisfy *Alice* Step 2); Complaint, ¶ 10 (accusing applications provided on a smartphone); Ex. B

20   [Oct. 2020 letter] at 2 ("BotsCrew's chatbot product is provided on a mobile device ….").

21   Although the Court need not consider the non-asserted dependent claims for this motion,

22   they also lack inventive concepts.  Claim 2 adds the limitation that the output file is playable

23   media file played through a text-voice converting system.  Claim 4 adds a generic user verification

24   process using a verification key through a generic verification system.  There is no allegation in

25   the complaint or the patent that these elements represent a technical advancement over the art.

26   Claim 5 recites additional steps for providing an administrative account and consumer

27   accounts associated with corresponding PC devices, using the administrative account to verify

28   reports uploaded by the consumer accounts, and saving the new reports into the reporting system

1    if validated.  No specific algorithms are recited to make the process non-routine or beyond the

2    realm of implementing human activity in a computer environment.  For example, when a doctor's

3    office receives a test report from a lab, the medical assistant will first verify that the report is

4    legitimate before using her credential to save the report as part of the patient's record.

5         Claim 6 limits the administrative account to that "operated by a health report-validation

6    system manage by the administrative system."  There is no detail on the validation system, which

7    as claimed can be a system operated by human beings.

8         Claim 7 specifies that the query is "a counselor-consultation request" received through the

9    personal assistance device and that the query is forwarded to an administrative account with the

10   extracted information returned to the PDA.  Merely narrowing the data query type and reciting

11   generic use of a computer as a tool does not represent a technical advancement over the art.

12        Claim 8 recites scanning, extracting and storing relevant information.  That is the same

13   computer-aided steps as found patent ineligible in *Content Extraction*, 776 F.3d at 1347-48.

14        Claim 9 describes a generic process for updating the health reports through plugins to

15   external libraries associated with the health reports.  The claim recites conventional elements (such

16   as external libraries, plugins, content-updating system) "in a purely functional manner" and hence

17   does not contain an inventive concept.  *Dropbox*, 815 Fed. Appx. at 533-34.

18        Claim 12 recites using a natural language-understanding system to generate query-related

19   expressions for saving into the query-related knowledge graph. The problem with the claim is that

20   there is no limitation on the natural language-understanding system or the manner by which the

21   query-related expressions are generated.  For example, there are no new algorithms for identifying

22   keywords that may improve the computer functionality.  The claim is once again drafted too

23   generically to contain an inventive concept.  *Dropbox*, 815 Fed. Appx. at 533-34.

24        Claim 13 that claims a self-learning process to update the report-related knowledge graph

25   suffers from the same problem by not describing any "specific, unconventional technological

26   solution, narrowly drawn to withstand preemption concerns, to a technological solution."  *Amdocs*

27   *(Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1306 (Fed. Cir. 2016).

28        Claims 10, 11, 14 and 15 recite specific information type for keyword indexing.  Limiting

1    the claims to a specific data type does not add an inventive concept.  *Elec. Power*, 830 F.3d at

2    1353 (claims ineligible for "collecting information, including when limited to particular content.").

3        For these reasons, the asserted claims of the '882 patent do not contain any inventive

4    concept that can transform them into patent eligible subject matter.

5        **B.**    **Optra Does Not Adequately Plead Infringement.**

6        Optra accuses BotsCrew of directly, indirectly and willfully infringes "at least Claims 1

7    and 3" of the '882 patent "literally or under the doctrine of equivalents."  Complaint, ¶¶ 14, 17,

8    19-20, 22.[6]  The Complaint, however, provides no factual allegation with respect to any product

9    except for the Chatbot application allegedly developed for Natera ("Natera Chatbot").  *Id.*, ¶¶ 9-

10   10, 14-15.  The Complaint does not allege what other products are at issue or that they operate in

11   the same manner as the Natera Chatbot.  *Id.*  Thus, infringement assertions with respect to those

12   unspecified products should be dismissed because the Complaint "makes no factual allegations

13   about how [these unspecified products] operate," that "these products are similar to the [Natera

14   Chatbot] or otherwise indicate that its factual allegations with respect to [Natera Chatbot] also

15   apply to these other products."  *Novitaz*, 2017 WL 2311407, at *4.  "As such, [Optra] fails to state

16   a claim for direct infringement with respect to" those unspecified products.  *Id.*

17       But even as to Natera Chatbot, the only example of an "Accused Product[]," the Complaint

18   does not allege that it practices every element of at least one exemplary claim.  For example, claim

19   1, Steps (F) and (G) both recite a "knowledge graphing system," "a query-related knowledge

20   graph and a report-related knowledge graph."  '882 patent, claim 1(F)-(G).  The Complaint,

21   however, provides no notice regarding what these components correspond to in Natera Chatbot or

22   even allege that they exist in the application.  Complaint, 6:16-19; *see* charts on pages 4-5 *supra*.

23       As an example, the '882 patent defines "[a] report-related knowledge graph" as "a

24   collection of data from the report and related information from other data sources, organized as a

25   graph of associations of various healthcare entities."  '882 patent, 3:15-18; *see also id.*, 2:62-65

26   ("the report-related knowledge graph is generated from the specific health report and other sources

27

28       _____

         [6] No contributory infringement is alleged.  *See* Complaint *generally*.

of information which can be … thesauruses, healthcare and literature databases").  The Complaint

does not allege that Natera Chatbot compiles such a collection of data "organized as a graph of

associations of various healthcare entities."  Complaint, ¶¶ 9-10, 15.  Nor does the complaint

allege that the chatbot application compiles "a query-related knowledge graph," *i.e.*, a collection

of "query-related expressions" "organized as a graph of associations."  *Id.*; '882 patent, 3:15-18

(definition indicates that a knowledge graph is "a collection of data … organized as a graph of

associations" of corresponding concepts or entities); 3:53-57 (in a preferred embodiment as

claimed in unasserted dependent claim 12, "a plurality of query-related expressions" are "saved

into the query-related knowledge graph").  Nor is there any allegation that the chatbot application

includes a system that would generate such query-related or report-related knowledge graphs.

Complaint, ¶¶ 9-10, 15.  Instead, the Complaint merely alleges that "[t]he Accused Products

compile corresponding knowledge corpus by gathering the collection of records associated with

the specific genetic tests."  *Id*, ¶ 15.  This allegation does not even assert that the collected records

include any knowledge graph, let alone the recited "query-related knowledge graph" and "report-

related knowledge graph."  *Id.*

Additionally, the claims require a list of query-related information be extracted "by

comparing and associating the query-related knowledge graph with the report-related knowledge

graph through the knowledge-graphing system."  '882 patent, claim 1(G).  The complaint instead

merely alleges that the list of query-related information is extracted "to be able to enable the

chatbot to function to provide responses for the queries from the personal assistance device."

Complaint, ¶ 15.  That allegation says nothing about how the extraction is done.

More importantly, the asserted claims are method-of-use claims.  While Optra accuses

"products and services that utilize the Genetic Testing Chatbot" of infringement, those "products

and services" amount to nothing more than software Botscrew has sold to others. *See* Complaint,

para. 9; Ex. B [Oct. 2020 letter] at 2 ("We believe that your healthcare chat

conversation ***software*** (chatbot) infringes … OptraHealth's patent.").  The Federal Circuit has held

that "a party that sells or offers to sell software containing instructions to perform a patented

method does not infringe the patent under § 271(a)."  *Ricoh Co. v. Quanta Computer Inc.*, 550

1   F.3d 1325, 1335 (Fed. Cir. 2009).  Thus, even if the Complaint sufficiently pled that the

2   referenced chatbot performed each step of the patented method (it does not), BotsCrew would not

3   infringe according to binding Federal Circuit law.

4        This is because, "even if [BotsCrew] suppl[ies] [a chatbot] preprogrammed to perform

5   multiple claimed steps, [BotsCrew] must still perform at least one step of a claimed method [itself]

6   to be held liable for direct infringement." *Adaptix, Inc. v. Apple, Inc.*, 78 F. Supp. 3d. 952, 954

7   (N.D. Cal. 2015).  Here, the Complaint alleges no facts from which to infer that BotsCrew itself

8   performed even one of the claimed steps in the United States; and the complaint alleges no facts

9   from which to infer that each of the steps is performed within the United States.  *NTP, Inc. v.*

10  *Research in Motion, Ltd.*, 418 F.3d 1282, 1317-18 (Fed. Cir. 2005) (holding "hold that a process

11  cannot be used 'within' the United States as required by section 271(a) unless each of the steps is

12  performed within this country").  This is an independent reason that the pleading for direct

13  infringement is insufficient.  *Cf.*, Complaint, ¶ 19 (alleging use by BotsCrew's partners and

14  customers "of the Accused Products constitute direct infringement of at least claims 1 and 3").

15       While Optra is not required to set forth its infringement theory as in an infringement

16  contention at the pleading stage, it still must provide sufficient "factual allegations that would

17  permit a court to infer that a required element of the patent claim was satisfied."  *Novitaz*, 2017

18  WL 2311407, at *3-*4 (dismissing complaint because it does not contain factual allegations with

19  respect to several critical elements); *see also AlterG*, 388 F. Supp. 3d at 1143-44 (dismissing

20  direct infringement assertion for failing to "allege that [accused] products practice every element

21  of at least one exemplary claim").  Consequently, the Court should dismiss the Complaint's direct

22  infringement claim and the indirect and willful infringement assertion based on the direct

23  infringement allegation.

24       The Court should also dismiss the indirect and willful infringement claims.  Indeed, this

25  Court has already dismissed nearly ***identical*** allegations of induced and willful infringement in

26  *Apple v. Princeps Interface Techs. LLC*, a likely inspiration for Optra's allegations here. *Compare*

27  Complaint at ¶¶19-20 (inducement) and ¶22 (willfulness) with *Apple v. Princeps Interface Techs.*

28  *LLC*, Case No. 3:19- cv-06352, 2020 U.S. Dist. LEXIS 52787 (N.D. Cal. March 26, 2020) at *7-8

1   (quoting Paragraphs 26 and 27 of Princeps's inducement counterclaim) and at *8 (quoting

2   Princeps' willfulness counterclaim).

3          Specifically, to survive a motion to dismiss, induced infringement allegations "must

4   contain facts plausibly showing that [BotsCrew] specifically intended their customers to infringe

5   the ['882] patent and knew that the customer's acts constituted infringement." *In re Bill of Lading*

6   *Transmission*, 681 F.3d 1323, 1339-40 (Fed. Cir. 2012). Here, there is no such allegation in the

7   complaint: in fact, there is not even any allegation whether BotsCrew has any knowledge of how

8   its client(s) deploys the chatbot application or whether any modifications were made to the

9   delivered application.  As to "willful blindness," there is bare assertion with no factual allegation

10  whatsoever.  Complaint , ¶¶ 14, 19-20.

11         Similarly, willful infringement allegations must contain facts supporting "egregious"

12  conduct. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1935 (2016) (enhanced

13  damages are reserved for "***egregious*** cases of misconduct ***beyond typical infringement***"); *see also*

14  *Finjan, Inc. v. Cisco Systems Inc.*, No. 17-cv-00072-BLF, 2017 WL 2462423, at *5 (N.D. Cal.

15  June 7, 2017) (granting motion to dismiss willfulness claims that "do[] not contain sufficient

16  factual allegations to make it plausible that Cisco engaged in 'egregious' conduct").  Here, the

17  Complaint merely alleges that about two months after the '882 patent issued and about 3 weeks

18  before filing the Complaint, Optra notified BotsCrew via a letter of BotsCrew's alleged

19  infringement of '882 patent and that BotsCrew (based overseas) did not respond to the letter.

20  Complaint, ¶¶ 21, 8.  The letter does not even present all elements of claim 1, removing the

21  reference to "query-interrogation system," "knowledge graph[s]" and "knowledge-graphing

22  system" when attempting to shake down BotsCrew.  Ex. B [Oct. 2020 letter] at 2.  Neither the

23  Complaint nor the letter therefore provides any fact that would allow the Court to infer that

24  BotsCrew had a subjective intent to infringe the '882 patent or that BotsCrew acted in a way that

25  was "willful, wanton, malicious, [in] bad-faith, deliberate, consciously wrongful, flagrant, or . . .

26  characteristic of a pirate." *Contra* Complaint, ¶¶ 21-22.

27  **V.    CONCLUSION**

28         For these reasons, BotsCrew respectfully requests that the Court dismisses the Complaint.

1    Dated:  March 29, 2021                        Respectfully submitted,

2                                                   THE MORROW FIRM, P.C.

3

4                                                   By:  */s/ Xinlin Li Morrow*

5                                                        Xinlin Li Morrow
                                                         xinlin@morrowfirm.com
6                                                        The Morrow Firm, P.C.
                                                         1880 Century Park E, Suite 815
7                                                        Los Angeles, CA 90067
                                                         Telephone: (213) 282-8166
8                                                        Attorneys for Defendant
                                                         BOTSCREW, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28